UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINA ANDERSON,

                Plaintiff,             Case No.: 11-cv-15636
                                     Honorable Arthur J. Tarnow
          v.                 Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 10]**

      Plaintiff Kristina Anderson brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.**      **RECOMMENDATION**

      For the reasons set forth below, the court finds that the ALJ was not required to recontact Anderson's treating physician and that her decision is supported by substantial evidence of record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [10] be GRANTED, Anderson's motion [9] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On January 6, 2010, Anderson filed an application for DIB, alleging disability as of March 27, 1998.  (Tr. 127-30).  The claim was denied initially on April 6, 2010.  (Tr. 89-93). Thereafter, Anderson filed a timely request for an administrative hearing, which was held on January 31, 2011, before ALJ Mary Connolly.  (Tr. 49-77).  Anderson, represented by counsel, testified, as did vocational expert ("VE") Annette Holder.  (*Id.*).  On February 15, 2011, the ALJ found Anderson not disabled.  (Tr. 12-27).  On October 21, 2011, the Appeals Council denied review.  (Tr. 1-6).  Anderson filed for judicial review of the final decision on December 23, 2011 [1].

### B.     Background

#### 1.     Disability Reports

In an undated disability report, Anderson reported that the conditions limiting her ability to work are chronic fatigue syndrome ("CFS") and fibromyalgia.  (Tr. 157).  She alleged that she stopped working full time on March 27, 1998, due to her conditions.  (Tr. 158).  She reported seeing two doctors for her conditions and taking several medications, including Darvocet and Sovelle for pain, Synthroid for her thyroid, and vitamin supplements for her CFS and fibromyalgia.  (Tr. 161-63).

In a February 3, 2010 function report, Anderson reported that she lives alone in a house and that her daily activities include making a simple breakfast, showering, swimming twice a week per doctor's instructions, and resting the remainder of the day.  (Tr. 166).  She feeds her two cats, reads, cooks a frozen meal for dinner or orders out and is able to do simple household chores.  (*Id.*).  She shops for groceries once a week on good days, and hires sometime to do

regular house maintenance weekly. (*Id.*). She reported that her conditions prevent her from working and participating in sports and activities and they interfere with her sleep. (Tr. 167). She reported having no troubles with personal care. (*Id.*).

Anderson reported cooking for herself twice a week for approximately 10-15 minutes, and having someone else prepare food the rest of the time. (Tr. 168). Someone else also performs all yard work, heavy house work and household repairs. (*Id.*). She is able to do minimal laundry once a week and clean up after herself. (*Id.*). She goes outside often in the summer, but not often in the winter due to discomfort from her conditions, and she can drive and ride in a car, needing no one to accompany her. (Tr. 169). She shops once or twice a week for at most an hour. (*Id.*). While she enjoys reading, sewing, working on her computer and watching television, she can no longer do these things for long periods of time due to her conditions. (Tr. 170). She talks on the phone with friends and family bi-weekly, and occasionally goes out to eat if she has someone to accompany her. (Tr. 170).

Anderson reported that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and use her hands. (Tr. 171). She reported she cannot lift more than 8 pounds, and cannot do any stair climbing, bending, standing or kneeling more than required to go to a doctor's appointment, for example. (*Id.*). She can walk five to ten minutes before needing to take a half-an-hour break to rest. (*Id.*). She reported no mental limitations. (Tr. 171-72).

In an undated disability appeals report, Anderson reported no change in her conditions, doctors or medications. (Tr. 185-89). In a recent medical treatment report, Anderson reported no medications for her fibromyalgia or CFS apart from vitamin supplements. (Tr. 192).

3

2.    *Plaintiff's Testimony*

Anderson testified that she had stopped working full time in 1995 as a surgical equipment salesperson and stopped working completely in 1998, due to an inability to keep up with her work as a result of fatigue and headaches.  (Tr. 54-57).  Her family doctor originally began giving her large doses of vitamins through intravenous injection upon a belief that Anderson's fatigue was the result of poor nutrition.  (Tr. 56).  She was approved for and received private disability insurance payments, but in approximately 2001 or 2002 she requested that the insurance company stop making those payments because she "wanted to try and get back [to work] if [she] could" and because she did not feel good about taking the money anymore when her family was financially stable.  (Tr. 58-60).  She testified that although she stopped receiving payments, she did not feel like she was able to work at that time.  (Tr. 59).

In 2006, Anderson attempted to return to work part-time as a gymnastics coach twice a week but was only able to do so for a couple of months before having to quit due to her conditions.  (Tr. 60-61).  She again began receiving private disability insurance payments.  (Tr. 61-62).  Her symptoms include extreme fatigue, joint and muscle pain, and an inability to focus on tasks.  (Tr. 62).  She currently undergoes massage therapy, and engages in yoga and swimming to treat her conditions.  (Tr. 63-64).  She testified that her most severe pain is in her hands, although she had never undergone an EMG.  (Tr. 64).  She also experiences pain in her knees, ankles and back.  (*Id.*).  She testified to difficulties with memory and concentration that had been ongoing for eight to ten years and that it now takes her more than a month to read a book whereas before she was able to read a book a week.  (Tr. 65-66).  Anderson grocery shops occasionally, close to home, but has help generally with shopping and other household chores, including cooking, although she is able to cook microwave meals.  (Tr. 67-68).

4

Anderson's day consists mostly of lying in bed or on the couch. (Tr. 69). She testified to headaches once or twice a week which require her to take an Excedrin, which helps. (*Id.*). When she has headaches she lies down in a dark quiet room for two to five hours. (Tr. 70). She also takes an Aleve daily as an anti-inflammatory. (*Id.*). She takes thyroid medication daily which causes nausea and shakiness. (Tr. 71-72). Anderson testified that her fibromyalgia also makes it difficult for her to sleep at night. (Tr. 72-73).

### 3.   Medical Evidence

#### a.   Treating Sources

The bulk of Anderson's treating physician records fall outside of her covered period from March 1998 to March 2002. Records from after expiration of a claimant's insured status are generally not relevant to whether or not the claimant was disabled during the period insured.[1] Therefore, such records will only be discussed to the extent they relate to Anderson's condition during the relevant period. For the same reasons, records preceding the alleged onset date are discussed herein only to the extent they shed light on her allegedly disabling conditions. In addition, some of the treatment records are partially or completely illegible, although many of the illegible records are dated after the covered period. Because the illegibility of these records

---

[1] For applications concerning disability insurance benefits, "the only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status." *Key*, 109 F.3d at 274. This is because a "'period of disability' can commence only while an applicant is fully insured. *Jones v. Comm'r of Social Security*, 121 F.3d 708 (6th Cir. 1997) (citing 42 U.S.C. § 416(i)(2)(C)). *See also Hamilton v. Apfel*, 178 F.3d 1294 (6th Cir. 1999) (citing *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)); 42 U.S.C. § 423(a), (c) and (d). Accordingly, a claimant who fails to prove she was suffering from a disability *while insured* does not become entitled to disability insurance benefits if she becomes disabled *after* her insured status expires. *Id.* This does not mean, however, that evidence post-dating the claimant's date last insured is irrelevant to the disability determination. Rather, while the ALJ generally only considers evidence from the alleged disability onset date through the date last insured, he may also consider later evidence to the extent it relates back to the claimant's condition during the relevant period. *King*, 896 F.2d at 205-06.

forms the sole basis of plaintiff's claim of error, the court will note the frequency of illegible records in its discussion of the evidence, but only to the extent the records are from, or relate to, the insured period.

### i.      Dr. Nedra Downing

At an appointment with Dr. Nedra Downing on January 13, 1997, Anderson reported exercising two to three times weekly but being exhausted afterwards.  (Tr. 240).  Dr. Downing noted some improvement in her fatigue.  (*Id.*).  On February 14, 1997, Anderson reported that her energy level was slowly improving but that she still had back and joint pain.  (Tr. 227).  Dr. Downing gave her a "balancing" treatment, along with electrical stimulation and hot packs. (*Id.*).  On March 27, 1997, Anderson reported periods of hyperactivity where she had increased energy followed by an inability to function the following day.  (Tr. 280).  However, overall she reported feeling better and that she would go out.  (*Id.*).  At an undated appointment, Anderson reported horseback riding for exercise, and trying to get out of the house.  (Tr. 282).  She did not go on vacation and she was having a hard time sleeping.  (*Id.*).  On July 8, 1997, Anderson reported a mix of hyper and tired days, but that she was exercising and doing well.  (Tr. 284).  At a July 28, 1997 appointment, Anderson reported exercising, walking and feeling better.  (Tr. 223).  She was diagnosed with hypothyroidism, due to inadequate thyroid dosage, and borderline anemia.  (*Id.*).  At an August 21, 1997 appointment, Anderson again reported feeling better and going horseback riding.  (Tr. 224).  At appointments on June 12 and October 14, 1997, Anderson reported having no migraines since being off birth control.  (Tr. 225; 236).  On February 5, 1998, Anderson reported having a new part-time job in sales.  (Tr. 358).  She reporting having felt weak and tired for two months, along with sinus congestion.  (*Id.*).  She was diagnosed with sinusitis and allergic rhinitis.  (*Id.*).  At a March 17, 1998 appointment, Anderson reported

extreme fatigue even though she was only working less than 20 hours a week.  (Tr. 204).  She also reported two migraine headaches in the past month which required pain medication.  (*Id.*).  On April 28, 1998, Anderson reported fatigue during and after her vacation and headaches.  (Tr. 361).  Anderson again complained of migraines at appointments on September 28 and December 28, 1998, and of headaches on January 9, 1999.  (Tr. 217-19).

ii.      Dr. Samson Kpadenou

At a January 16, 1998 appointment, Dr. Kpadenou recommended that Anderson follow a low fat diet and exercise to alleviate her high cholesterol.  (Tr. 206).  At an appointment on January 28, 1998, Anderson reported being too fatigued to go to dinner or on vacation.  (*Id.*).  She reported that she could not work because she could not handle the stress.  (*Id.*).  She also reported frontal headaches along with seasonal allergies.  (*Id.*).  At an April 28, 1998 appointment, Anderson reported fatigue on her vacation and a headache.  (Tr. 208).  At an August 14, 1998 appointment, Anderson complained of sleeplessness, reported a history of CFS and that she had been off work for two years due to her CFS and an "allergy to formaldehyde." (Tr. 212).  She also reported migraine headaches.  (*Id.*).  A blood test conducted on August 14, 1998, to measure the amount of Anderson's "free T3" returned an abnormally high result.  (Tr. 203).  Based on those results, as well as an elevated TSH level, Anderson underwent a thyroid scan on November 10, 1998, which was normal, although the elevated levels raised a "suspicion" that she might "have Hashimoto's thyroiditis with mild resulting hypothyroidism." (Tr. 215).  At a September 14, 1998 appointment, Anderson was diagnosed with migraine headaches and hypothyroidism.  (Tr. 217).  A CT scan of her head and paranasal sinuses ordered that same day was normal.  (Tr. 213).

On March 16, 1999, Anderson was diagnosed with gastroenteritis and IBS.  (Tr. 318).

7

On April 16, 1999, she was diagnosed with CFS and headaches. (*Id.*). On May 20, 1999, Anderson reported more stress in her life since her husband was found to have Hodgkin's lymphoma. (Tr. 320). She reported zapped energy and not sleeping well. (*Id.*). She stated that she was trying to cut down on activity until she was healthy. (*Id.*). Dr. Kpadenou diagnosed her with CFS and Hashimoto's thyroiditis. (*Id.*). At a June 29, 1999 appointment, Anderson reported continued stress, inability to sleep and frequent headaches. (*Id.*). Her diagnoses did not change. (*Id.*). Dr. Kpadenou noted that she was "not able to return to work yet." (*Id.*). On September 21, 1999, Anderson reported not doing well. (Tr. 317). While parts of the notes are illegible, one portion states that "she will work[,] be able to work full time." (*Id.*). She also reported an allergy to formaldehyde and that this would affect her ability to work in the operating room, or in sales. (*Id.*). Dr. Kpadenou also made a note that Anderson would "not be able to work more than 20 hours a week for now." (*Id.*). He diagnosed her with CFS and headaches and noted that she will attempt to return to work 20 hours a week with no sales job, no operating room work and no lifting. (*Id.*). On November 2, 1999, Dr. Kpadenou diagnosed Anderson with CFS and the flu. (*Id.*). A letter to Dr. Kpadenou from Anderson's disability insurance company noted that the doctor had previously indicated in a report that Anderson would be able to return to work on November 1, 1999, "with restrictions," but that the company was not clear as to what those restrictions were. (Tr. 321). No response to this letter, nor the report referenced in the letter, is found in the record. At an appointment on December 28, 1999, issues regarding development of a cyst and intestinal complications from use of an antibiotic were discussed. (Tr. 316).

On March 8, 2000, Anderson complained of continued stress which affected her symptoms. (*Id.*). Something about returning to work was noted, along with something about

restrictions, but the rest is illegible. (*Id.*). She was diagnosed with CFS. (*Id.*). Notes from what was possibly an August 6 or 16, 2000 appointment are generally illegible, although at that appointment Anderson was diagnosed with a hormone imbalance and the doctor asked her to discontinue Cytomel and he would start her back on it later. (Tr. 315). On September 13, 2000, she complained of a possible allergic reaction to some illegible medicine. (*Id.*). On October 19, 2000, Anderson reported "doing fairly well", and Dr. Kpadenou lowered her dose of thyroid medication. (Tr. 483). On December 4, 2000, Anderson reported doing better and that her fatigue had improved, although she still had a great deal of stress. (*Id.*).

On January 22, 2001, Dr. Anderson reported being under a lot of stress dealing with a relapse of her husband's disease. (Tr. 309). She reported not sleeping well and using Xanax for anxiety. (*Id.*). Dr. Kpadenou diagnosed her with a sleep disorder and an anxiety disorder. (*Id.*). On what appears to be April 13, 2001, Anderson reported still being under stress. (Tr. 484). The remainder of this treatment note is illegible. (*Id.*). On April 24, 2001, she reported "doing quite well." (*Id.*). The following page of treatment notes has dates that are cut off and the one appointment on that sheet is generally illegible although it appears her exam consisted of a check of her blood pressure and heart rate. (Tr. 485). She was diagnosed with a "viral" issue. (*Id.*). At a May 30, 2001 appointment, Dr. Kpadenou noted that Anderson was doing better and was going to Texas, though the note regarding the purpose of her trip is illegible. (Tr. 308). He also noted that she was under a great deal of stress and was having trouble sleeping. (*Id.*). On July 20, 2001, Dr. Kpadenou noted an elevated cholesterol level and headaches. (*Id.*). At an October 12, 2001 appointment, Anderson complained of an upper respiratory tract infection and fever. (Tr. 307). On November 29, 2001, she complained of an allergic reaction causing red bumps on her face. (*Id.*). At a December 5, 2001 appointment Anderson reported doing better, but still

being under stress because of her husband's disease. (Tr. 312). Blood test results were reviewed at this appointment and Anderson was diagnosed with anxiety and headaches. (*Id.*).

Notes from a January 17, 2002 appointment are mostly illegible due to poor scanning, although Anderson's primary complaint on that date was right foot numbness that she suspected was from a medication reaction. (Tr. 486). On February 6, 2002, Anderson reported an allergic reaction to one of her medications. (Tr. 417). On July 30, 2002, Anderson complained of hypothyroid symptoms, and on September 3, 2002, she reported having "started exercising for stress." (Tr. 487). Although the dates are cut off, it appears that at one appointment in late 2002 Anderson was diagnosed with hypothyroid disorder. (Tr. 413). At another appointment in 2002 with the date cut off, Anderson complained of migraines and reported starting to exercise regularly, and was diagnosed with hypothyroid, hyperlipidemia and anxiety. (Tr. 488). At a subsequent appointment on October 2, 2002, a Z-pack of antibiotics was prescribed. (*Id.*). At a subsequent appointment in 2002, Anderson reported still being under a good deal of stress, but that she was doing better with her medication. (*Id.*). She was diagnosed with hypothyroid disorder and anxiety and prescribed Xanax. (*Id.*). At an appointment on December 12, 2002, Anderson reported that she was "looking for a job – part time or full time." (Tr. 489). She was diagnosed with fibromyalgia, CFS and hyperlipidemia. (*Id.*).

In 2009 and 2010, Dr. Kpadenou filled out a number of forms for Anderson's disability insurance provider, which consistently diagnosed her with CFS and fibromyalgia. (Tr. 450-57; 459; 461; 463-471). For example, on April 1, 2009, Dr. Kpadenou found that Anderson had been completely disabled by her conditions from January 23, 2009, through April 1, 2009, with a probable return to work date of May 31, 2009. (Tr. 470-71). On October 23, 2009, Dr. Kpadenou found that the length of Anderson's disability from CFS and sleep disturbances was

"hard to determine" because of the history of the disease.  (Tr. 469).  He cited "some point tenderness in the upper quadrants" to support his diagnoses.  (*Id.*).  In a December 9, 2009 form, Dr. Kpadenou again diagnosed Anderson with fibromyalgia and CFS and concluded that he was unable to determine the time frame of her potential improvement.  (Tr. 468).  He noted the same in forms filled out on January 7, 2010.  (Tr. 466-67).  In a form from February 4, 2010, Dr. Kpadenou diagnosed Anderson with fibromyalgia, CFS, sleep disturbances and medication reactions, and noted that she suffered an exacerbation of her conditions on January 23, 2009. (Tr. 464).  He based his diagnoses on "point tenderness."  (*Id.*).  He concluded that Anderson had been disabled now "since [her] first visit in 1997."  (Tr. 465).  On March 4, 2010, Dr. Kpadenou added lowered cognitive ability to his list of diagnoses, again supported by "tenderness points in the 4 quadrants."  (Tr. 463).  He concluded essentially the same in forms dated April 9, 2010, May 3, 2010, June 3, 2010, July 9, 2010, August 6, 2010, September 1, 2010, October 5, 2010, and November 5, 2010.  (Tr. 450-57; 459; 461).

On November 8, 2010, Dr. Kpadenou completed a CFS medical source statement.  (Tr. 472-76).   In it, he also diagnosed Anderson with depression, anxiety, slow mentation, fibromyalgia, hypothyroid disorder, non-restorative sleep and sleep disturbances.  (Tr. 472).  He noted that her history of fatigue "started after [a] long period of stress in 2000" and a "long history of working."  (*Id.*).  He noted that her condition would be expected to last more than twelve months, and that he had been able to exclude other impairments as a cause of her fatigue through "multiple diagnostic tests" including an ECG and a sleep study.  (*Id.*).  He found that Anderson's symptoms included self-reported impairment in short-term memory, muscle pain, headaches, unrefreshing sleep and post-exertional malaise.  (Tr. 473).  He had observed "persistent reproducible muscle tenderness on repeated examinations, including the presence of

positive tender points," as well as upper respiratory tract infections during the course of treatment. (*Id.*). He noted no laboratory findings. (*Id.*). His treatment response consisted of prescriptions of Halcyon, Zoloft and another illegible medicine. (Tr. 474). He found Anderson could walk two blocks without rest, sit or stand for five minutes each and each less than two hours a day and that she needed to take five to six breaks a day of 30 minutes to an hour each. (Tr. 474-75). She could rarely lift less than 10 pounds and never more than 10 pounds. (Tr. 475). She could rarely twist or stoop, and never crouch or squat or climb ladders or stairs. (*Id.*). She also had significant limitations in reaching, handling and fingering, being able to use her hands between 5-15% of the time. (*Id.*). She was likely to be off-task 25% or more of the time due to attention and concentration problems. (*Id.*). He noted that she occasionally had bad days but no good days. (Tr. 476). Dr. Kpadenou found Anderson incapable of working, even at low stress jobs. (*Id.*).

Also on November 8, 2010, Dr. Kpadenou filled out a fibromyalgia residual functional capacity ("RFC") questionnaire for Anderson. In addition to fibromyalgia, he diagnosed her with sleep disturbances, CFS and thyroid function deregulation, and his prognosis was guarded. (Tr. 538). Her symptoms included multiple tender points, nonrestorative sleep, CFS, irritable bowel syndrome, frequent, severe headaches, urinary problems, anxiety, panic attacks, depression, and hypothyroidism. (*Id.*). He determined that she was not a malingerer. (*Id.*). He noted constant pain in Anderson's lumbosacral and cervical spine, as well as in her shoulders, arms, hands, fingers, hips, knees, ankles and feet. (Tr. 539). Her condition frequently interfered with her attention and concentration and she was incapable of even low stress jobs. (*Id.*). She was capable of walking less than one block, sitting for 20 minutes at a time and standing for 5 minutes at a time. (Tr. 539-540). She could sit and/or stand less than two hours a day. (Tr.

12

540).  She could rarely lift less than 10 pounds and never more, rarely twist, stoop or crouch, and never climb ladders or stairs, rarely look down and only occasionally look up, turn her head or hold it static.  (Tr. 541).  She could only user her hands 5-15% of the time depending on the task.  (*Id.*).  Dr. Kpadenou noted that Anderson had more bad days than good.  (Tr. 541).  He concluded that her condition had prevented her from working since December 5, 2001.  (*Id.*).

### b.    Consultative and Non-Examining Sources

On September 23, 2009, Anderson underwent an independent medical examination to evaluate her CFS and fibromyalgia for her private disability insurance provider.  (Tr. 446-48).  Dr. Steve Geiringer examined her and reviewed her medical records.  (Tr. 446).  He noted the general illegibility of Dr. Kpadenou's records, specifically those from 2007 and 2008.  (*Id.*).  He noted that a form from Dr. Kpadenou's office on April 1, 2009, listed diagnoses of CFS and fibromyalgia, with a probable return to work date of May 31, 2009.  (*Id.*).  He also mentioned that the file contained notes from a conversation with Dr. Kpadenou on July 21, 2009, where it is shown that Anderson "did not meet ACR criteria for fibromyalgia."  (Tr. 447).  According to this note, Dr. Kpadenou did not put any formal restrictions on Anderson at this time, but "thought that she should only be active to her level of tolerance."  (*Id.*).  Anderson reported to Dr. Geiringer that she suffered from fatigue and pain, which was mainly centered in her hands and thoracic spine.  She was being treated with Cymbalta and Darvocet.  (*Id.*).

Upon examination, Dr. Geiringer noted a full range of motion in Anderson's spine, although there was pain in the mid to low thoracic region upon extension and tenderness in those muscles.  (Tr. 447).  However, he found no tenderness over any of the low back structures, and a straight leg raising test was negative.  (*Id.*).  Her lower and upper limb neurological exams were normal, her neck motions were full and pain free in all directions, and there was no deformity in

13

her hands or wrists.  (*Id.*).  Dr. Geiringer did not feel the need to conduct any diagnostic testing but concluded that Anderson did not meet the criteria for fibromyalgia or myofascial pain based on his examination.  (Tr. 448).  He was unable to address the CFS from his standpoint.  (*Id.*).

On March 23, 2010, Anderson underwent an independent medical examination for her private disability insurance provider to evaluate her CFS.  (Tr. 442-44).  Dr. Martin Learner examined Anderson.  (*Id.*).  Anderson reported current symptoms of headaches and "life-altering fatigue at all times."  (Tr. 442).  She also reported flu-like symptoms, constant sore throat and that she had been informed of elevated cytomegalovirus and Epstein-Barr virus titers.  (*Id.*).  She also reported cognitive difficulty, severe muscle aches and shoulder, neck, hand, back and knee pain.  (*Id.*).  She reported being diagnosed with CFS by Dr. Downing in 1995.  (*Id.*).  Her energy score was reported as 3 which Dr. Learner interpreted as "she can only be up out of bed for 2-4 hours a day."  (*Id.*).  Anderson reported taking a number of medications, including Amrour Thyroid and Savella for pain.  (Tr. 443).  She also reported twice a week headaches with nausea and light sensitivity.  (*Id.*).  Upon examination, Dr. Lerner noted athlete's foot, up-to-date Pap smear and mammogram, 2-3 times enlarged thyroid, grade 2 holosystolic murmur at the apex of her heart, and negative examinations of the abdomen, neurological system.  (*Id.*).  Dr. Lerner did not conduct any laboratory tests as part of his examination and noted that no previous lab tests had been provided to him.  (*Id.*).  He concluded that Anderson "may very well have the chronic fatigue syndrome," but that to determine this she would need to be further evaluated, including undergoing an "electrocardiogram, 24-hour ECG Holter, comprehensive metabolic panel, urinalysis," as well as a number of other tests.  (Tr. 443-44).  He concluded that Anderson "is totally incapacitated at this time.  She is essentially bed-bound and unable to do ordinary activities such as going to the grocery store and working in any capacity."  (Tr. 444).  Dr. Lerner

14

opined that with treatment there was a possibility that Anderson could recover and "be perfectly capable of performing her prior work." (*Id.*).

### 4. Vocational Expert's Testimony

VE Annette Holder testified that Anderson's past work was classified as skilled and light. (Tr. 73). The ALJ asked the VE whether a hypothetical claimant of Anderson's age, educational level, and vocational history, who was limited to sedentary work, could perform Anderson's past work. (*Id.*). The VE testified that such a claimant could not perform Anderson's past work. (*Id.*). The ALJ then asked whether, if he added to that hypothetical a need for unscheduled frequent rest breaks up to two hours a day and absences of once a week, would that preclude work. (Tr. 74). The VE testified that such restrictions would preclude all competitive work. (*Id.*).

Anderson's counsel then asked the VE if a hypothetical claimant limited to sedentary work who also could only sit less than two hours and day and stand or walk less than two hours a day could perform work. (Tr. 75). The VE testified that such a person would be precluded from work. (*Id.*). Counsel then asked if a person needed to take unscheduled breaks five to six times a day for 30 to 60 minutes, would that preclude work, and the VE answered in the affirmative. (*Id.*). Counsel asked if an individual was incapable of handling even low-stress jobs, would that preclude all work, and the VE testified that it would. (*Id.*). Counsel asked if an individual was off-task for 25 percent or more of an eight-hour work day, would that preclude all work, and the VE testified that it would. (Tr. 76). Finally, counsel asked if an individual was limited with respect to the use of her hands for grasping, turning and twisting objects up to 5-10 percent of the day, would that preclude work, and the VE testified that it would. (*Id.*).

### C. Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

16

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Anderson not disabled.  At Step One she determined that Anderson had not engaged in substantial gainful activity since her alleged onset date of March 27, 1998, through her date last insured of March 31, 2002.  (Tr. 17). At Step Two the ALJ found that Anderson suffered from the severe condition of fibromyalgia. (Tr. 18).  At Step Three she determined that Anderson's condition did not meet or medically equal a listed impairment.  (*Id.*).  The ALJ next assessed Anderson's RFC, finding her capable of the full range of sedentary work.  (*Id.*).  At Step Four she determined that Anderson could not perform any past relevant work based on her RFC.  (Tr. 23).  Finally, at Step Five, the ALJ relied on the Medical Vocational Guidelines, which directed a finding of "not disabled" based on Anderson's age, education, work experience and RFC.  (*Id.*).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Anderson's sole argument is that the ALJ's analysis – her determination of what conditions were severe, her RFC assessment, and her ultimate conclusion of "not disabled" – is

18

flawed because the majority of the treating physician records are illegible.  Anderson argues that the ALJ, recognizing that issue in her decision, had a duty to recontact the treating physicians and obtain more legible records or a transcription of the treatment notes.  Anderson argues that the ALJ's rejection of Dr. Kpadenou's opinions was flawed because she could not ascertain the basis of his opinions with illegible treatment records.

Pursuant to Social Security Ruling 96-5p, ALJs are required to recontact treating physicians who provide opinions on the issue of disability when two criteria are met:  (1) "the evidence does not support a treating source's opinion," and (2) "the adjudicator cannot ascertain the basis of the opinion from the record."  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 (6th Cir. 2010) *citing* SSR 96-5p, 1996 SSR LEXIS 2 at *16.  In *Ferguson*, the Sixth Circuit concluded that while the first criteria was met because the ALJ found that the evidence did not support the treating physician's opinion, the second criteria was not met because the ALJ did not just "thr[o]w up his hands" and ignore or disregard the treating physician's notes "entirely."  *Id.* at 272-73.  Instead, he "explicitly referred to and quoted from" the treating physician's notes "extensively," and relied on those notes to reject other medical opinions.  *Id.*.  Furthermore, instead of rejecting the treating physician opinion because the basis for the opinion was unclear, the ALJ rejected it because it was not supported by objective medical evidence.  *Id.*

Here, as in *Ferguson*, the first criteria is met because the ALJ concluded that Dr. Kpadenou's opinions were not supported by the evidence, but the second criteria is not met because the ALJ was able to ascertain the basis of his opinions from the record.  While noting that "the majority of the medical notes from the claimant's treating physicians are illegible," the ALJ went on to detail and interpret a number of Dr. Kpadenou's treatment notes in her opinion:

> Samson Kpadenou, M.D., treated the claimant for a number of complaints.
> On April 21, 1998, the claimant complained that she was too tired to go

out for dinner or to go on vacation. The claimant reported that she had returned to work in February and March 1998 but that she could not handle the stress and had to quit. Treatment notes dates August 14, 1998, reveal that the claimant complained of sleeplessness. She reported a history of chronic fatigue syndrome. The claimant stated that she had not worked for 2 years due to her fatigue. She also had migraine headaches. A CAT scan of the head performed on September 14, 1998, revealed normal results. A thyroid scan dated November 10, 1998, revealed slightly elevated trapping estimate raising suspicion of Hashimoto's thyroiditis with mild resulting hypothyroidism. On June 29, 1999, the claimant reported that she was not able to return to work. Treatment notes dated September 21, 1999, reveal that the claimant's physician released her to work 20 hours per week with no lifting. Treatment notes dated March 8, 2000, reveal that the claimant was released to return to work by April 2, 2000, with no restrictions.

After the claimant's date last insured, Dr. Kpadenou treated the claimant for a variety of complaints including hypothyroid, anxiety, crying spells, hyperlipidemia, upper respiratory infection, irritability, headache, and sleep disturbance. The claimant consistently reported that she was doing well and had only minor complaints. She took Halcyon and Xanax as needed for anxiety. The claimant was diagnosed with fibromyalgia, chronic fatigue syndrome, hypothyroidism, headaches, and sleep disturbance.

(Tr. 21, *internal citations to the record omitted*).

The ALJ then discussed Dr. Kpadenou's two disability opinions, and concluded that they should be afforded little weight because they were inconsistent with the medical evidence as a whole and with Anderson's own recitation of her daily activities. (Tr. 21). Specifically, the ALJ noted that "Dr. Kpadenou's [RFC] assessment of the claimant is not supported by his own records or those of other doctors who saw the claimant in the years between 1998 and 2002." (Tr. 21). The ALJ noted that although "[t]he claimant has numerous records from several doctors for complaints of headaches, anxiety, hypothyroidism, and either chronic fatigue syndrome or fibromyalgia, [ ] her visits appear infrequent before the date last insured. Also all of the diagnostic tests for the claimant's complaints were negative." (Tr. 22). The ALJ also noted that "the reports that are legible from all the [sic] her treating physicians do not include

20

any actual information other than the claimant's subjective complaints to support her total disability." She noted that Dr. Kpadenou's opinions were inconsistent with each other as well, with the CFS opinion finding Anderson capable of sitting only five minutes at a time, and the fibromyalgia opinion finding her capable of sitting for 20 minutes. (Tr. 21). The ALJ further noted that Anderson reported having taken care of her sick husband for some time, had terminated her own long-term disability benefits in 2002, and that a notation in a medical treatment record from 2002 stated that she was looking for work at that time. (Tr. 22). Based on the foregoing, Anderson's assertion that the "ALJ simply summarily concluded she had enough evidence despite having openly acknowledged on the record that many of Dr. Kpadenou's notes were not legible," Doc. #11 at 5, lacks merit.

The court finds that here, just as in *Ferguson*, the ALJ did not just throw up her hands and declare Dr. Kpadenou's opinions invalid based on an inability to ascertain the basis for those opinions, but instead specifically referenced a number of his treatment notes that contradicted those opinions. She also pointed out numerous inconsistencies between Dr. Kpadenou's opinions and other evidence of record, which further undermined his opinions and Anderson's credibility. (Tr. 22). Moreover, based on the court's own review of the records at issue, it finds that substantial evidence supports the ALJ's conclusion. As the ALJ pointed out, Dr. Kpadenou's legible treating records (which, during the insured period appear to be most of them) do not include any objective basis for his ultimate opinion of disability. They are mostly a recitation of Anderson's subjective complaints, a check of her blood pressure and heart rate, and an occasional discussion of her thyroid level. While admittedly even those treatment records are not one-hundred percent legible, in its review, the court was unable to find anything in the records for the insured period where Dr. Kpadenou even tested for muscle tender points, let alone recorded what those findings were. Nor is there evidence of the ECG or sleep study he cited as the objective evidence underlying his opinion of

disability. Therefore, substantial evidence supports the ALJ's conclusion that Dr. Kpadenou's own treatment notes do not support his opinion of disability, and as such, she was not required to recontact him in order to render her decision. *See Ferguson*, 628 F.3d at 272-74; *Lovelace v. Astrue*, No. 10-109, 2011 U.S. Dist. LEXIS 72922 at *6-8 (E.D. Tenn. July 7, 2011) (although records largely illegible, no error where ALJ was able to discern that basis for treating physician opinion was subjective complaints rather than objective medical findings).

The court rejects Anderson's argument that the ALJ had an absolute obligation to re-contact her treating physicians simply because a majority of *all* the treating physician records were allegedly illegible. Anderson is wrong to suggest that the "substantial evidence" analysis is a purely volume-driven exercise. Rather, as explained above, "substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241. This court must affirm the Commissioner's decision if it is supported by substantial evidence, "even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286. For the reasons discussed above, the ALJ's conclusions were supported by substantial evidence.

Finally, the court rejects Anderson's argument regarding the illegibility of her purported specialists' records. The court is unsure what "specialists" Anderson is talking about, as the handwritten medical records in the file appear to either be from Dr. Downing or Dr. Kpadenou, neither of which Anderson alleges to be a specialist (some handwritten records are categorized in the transcript as being from an "M. Weiss, D.O.," but review of those records shows that they are consistent in form and handwriting as either being from Dr. Downing or Dr. Kpadenou (Tr. 307-66)). The only "specialist" records appear to be from consulting physicians ordered to examine Anderson for her private disability insurance provider, and those records are typed. (Tr. 442-44; 446-48). Furthermore, Dr. Downing, to the extent she is a specialist, never issued an opinion on

22

Anderson's ability to work.  And, at any rate, this argument does not change the overarching fact that substantial evidence supports the ALJ's findings.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Anderson's Motion for Summary Judgment [9] be DENIED, the Commissioner's Motion [10] be GRANTED and this case be AFFIRMED

Dated: September 18, 2012                    s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 18, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager